UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

———————

DANIEL R. EMPLIT,

               Plaintiff,

vs.

KRISTI NOEM, Secretary, United States
Department of Homeland Security, and
RODNEY S. SCOTT, Commissioner,
United States Customs and Border Protection,

               Defendants.

Case No.
Hon.
Mag.

————————————————————/

James C. Baker (P626668)
STERLING ATTORNEYS AT LAW, P.C.
Attorney for Plaintiff
33 Bloomfield Hills Pkwy., Ste. 250
Bloomfield Hills, MI 48304
(248) 644-1500
jbaker@sterlingattorneys.com

————————————————————/

## COMPLAINT AND JURY DEMAND

Plaintiff Daniel R. Emplit, by his attorney James C. Baker (P62668) of Sterling Attorneys at Law, P.C., for his Complaint and Jury Demand against Defendant Kristi Noem, Secretary, United States Department of Homeland Security, and Rodney S. Scott, Commissioner, United States Customs and Border Protection, submits:

## JURISDICTIONAL ALLEGATIONS

1.      Plaintiff is an individual residing in Sault Ste. Marie, Chippewa County, Michigan.

2.      Defendant Kristi Noem is the Secretary, United States Department of Homeland Security (DHS).

3.      Defendant Rodney S. Scott is the Commissioner, United States Customs and Border Protection (CBP).

4.      Plaintiff is a Border Patrol Agent (GS-1896-12) with U.S. Customs and Border Protection (CBP), currently assigned to non-disciplinary administrative leave status since October 4, 2023; with his assigned duty station being the Sault Ste. Marie Station, in Sault Ste. Marie, Michigan.

5.      Defendants DHS and CBP are federal agency employers as defined in the Rehabilitation Act of 1973, 29 USC 701, *et seq*.

6.      This Court has federal question jurisdiction under 28 USC 1331 because this action arises under the laws of the United States.

7.      This Court has jurisdiction pursuant to 29 USC 793 and 29 USC 794.

8.      Venue is proper in this district under 28 USC 1391(a)(2) and (b)(2) because a substantial part of the events giving rise to this claim occurred in this judicial district.

## EEO/EEOC Action

9.     Plaintiff timely sought counseling stemming with the Agency EEO from his experiences of disability discrimination and retaliation by the Agency, and timely filed charges therewith.

10.     On August 22, 2024, Plaintiff filed a formal Complaint alleging discrimination, hostile work environment, and reprisal/retaliation because of a perceived disability.

11.     Thereafter, on September 18, 2024, November 28, 2024, December 5, 2024, and April 1, 2025, Plaintiff filed amendments to his formal Complaint, which were accepted by the Agency EEO.

12.     The Complaint includes:

**Whether U.S. Customs and Border Protection (CBP) discriminated against Complainant, Border Patrol Agent (BPA), GS-1896-12, assigned to the Detroit Sector, Sault Sainte Marie Station, Sault Sainte Marie, MI, based on age (YOB: 1973), disability (perceived), and reprisal (participation), when:**

1. **Since October 4, 2023, and continuing, Complainant has been subjected to a hostile work environment with regard to the below:**

   a. **On October 10, 2023, Complainant was threatened with termination if he did not sign a medical release form.**

   b. **On October 10, 2023, Complainant was ordered to undergo a Fitness for Duty Examination (FFDE) with a subsequent medical examination on November 21, 2023, and psychological assessment on December 21, 2023.**

   c. **On March 18, 2024, Complainant was issued an initial options letter advising him he was found unfit for duty as a BPA or any other federal position, and he could either apply for retirement or resign.**

   d. **On June 14, 2024, Complainant learned management shared his perceived disability status with other employees, and had other employees follow and make observations of Complainant.**

    *e.* **On October 22, 2024, and again on November 25, 2024, Branch Chief Matti Weinert ordered Complainant to sign additional medical releases.** *(Amendments filed November 28, 2024, and December 5, 2024)*

    *f.* **In or about 2024/2025, Complainant's personally owned vehicle and residence were searched, as well as other neighboring homes in the area.** *(Amendment filed April 1, 2025)*

    *g.* **On March 17, 2025, Complainant was issued a letter proposing to remove him from his position and from federal service. (***Amendment filed April 1, 2025)*

2. **Since October 4, 2023, and continuing, Complainant's law enforcement authority has been revoked, he has been on paid administrative leave and not permitted to work despite having provided medical notes clearing him for full duty; and the information relied upon in this decision was not provided.**

3. **On August 20, 2024, Complainant was issued a revised options letter advising he could either request reassignment, apply for retirement, or resign.** *(Amendment filed September 18, 2024)*

**Claim #1a. On October 10, 2023, Complainant was threatened with termination if he did not sign a medical release form.**

**Claim #1b: On October 10, 2023, Complainant was ordered to undergo a Fitness for Duty Examination (FFDE) with a subsequent medical examination on November 21, 2023, and psychological assessment on December 21, 2023.**

**Claim #1c: On March 18, 2024, Complainant was issued an initial options letter advising him he was found unfit for duty as a BPA or any other federal position, and he could either apply for retirement or resign.**

**Claim #1d: On June 14, 2024, Complainant learned management shared his perceived disability status with other employees and had other employees follow and make observations of Complainant.**

**Claim #1f: In or about 2024/2025, Complainant's personally owned vehicle and residence were searched, as well as other neighboring homes in the area.**

**Claim #2: Since October 4, 2023, and continuing, Complainant's law enforcement authority has been revoked, he has been on paid administrative leave and not permitted to work despite having provided medical notes clearing him for full duty; and the information relied upon in this decision was not provided.**

**Claim#3: On August 20, 2024, Complainant was issued a revised options letter advising he could either request reassignment, apply for retirement, or resign.**

13.    On March 13, 2025, the Agency issued Plaintiff a Notice of Proposed Removal from Federal Service.

14.    Plaintiff received the Notice on March 17, 2025.

15.    Plaintiff's designated representative corresponded with the Agency on March 26, 2025 and requested all material relating to the adverse action proposed against Plaintiff.

16.    No response was received from the Agency.

17.    On July 3, 2025, the undersigned as Plaintiff's further designated representative corresponded with the Agency responding to the proposed removal from federal service.

18.    The Agency EEO has yet to issue any Report of Investigation (ROI).

19.    The Agency has not issued any Final Agency Decision (FAD) relative to the EEO.

20.    No final hearing or decision has been rendered by the EEO and/or the Agency.

21.    Plaintiff was not offered, and did not request any Agency hearing or decision relative to the EEO.

22.    More than 180 days have passed since Plaintiff filed his Complaint.

23.    Plaintiff filing this lawsuit is proper pursuant to 29 CFR § 1614.407.

## GENERAL ALLEGATIONS

### Plaintiff was a competent and qualified BPA.

24.    Plaintiff is a CBP employee since August 2010.

25.    Plaintiff has served several functions for CBP, from Border Patrol Agent, to Border Patrol Academy Instructor, Strategic/Investigative/Partner Agency Coordinator, and Task Force Officer.

26.    His current duty station, despite detailed to administrative leave, is the Sault Ste. Marie (MI) Border Patrol Station.

27.    Plaintiff is designated a GS-1896-12, Step 7, despite not being afforded any opportunities for overtime, advancement, promotion to supervisor/Grade 13, and/or other federal employment opportunities because of his administrative leave status.

28.    Plaintiff has faced regular and systematic harassment and treatment which has created a hostile work environment, all because he is perceived as disabled.

29.    There has been no interactive process employed by the Agency, which is required if the Agency perceives him too disabled to perform his duties as a Border Patrol Agent.

30.    In fact, the Agency has stated there are no accommodations available to Plaintiff and his perceived disability.

**Plaintiff had his law enforcement authority revoked.**

31.    On September 25, 2023, Plaintiff's personal truck was searched without authority or permission given.

32.    On September 27, 2023, Plaintiff's personal residence and other residences were searched without authority and without Plaintiff's consent.

33.    On October 4, 2023, Plaintiff was served a letter dated October 3, 2024, stating his law enforcement authority and authorization to carry his Agency-issued firearm was being temporarily revoked.

34.    According to the letter, the revocation was based on concerns regarding Plaintiff's mental health and ability to safely perform his duties as a Border Patrol Agent.

35.    Specifically, local management reported that the Agency perceived Plaintiff was exhibiting paranoid behavior.

36.    Plaintiff was placed on administrative leave effective immediately until such a time as the Agency determined he could safely perform his duties as a Border Patrol Agent.

37.    That administrative leave has continued uninterrupted to present.

**Plaintiff is ordered to undergo a FFDE.**

38.    Plaintiff received a letter on October 10, 2023 instructing him to report for a fitness for duty evaluation (FFDE) to determine his capacity to perform his duties as a Border Patrol Agent.

39.    Plaintiff was ordered to sign a form entitled: "AUTHORIZATION FOR RELEASE OF MEDICAL RECORDS."

40.    The Agency threatened Plaintiff that his failure to comply would result in disciplinary action up to and including removal from service.

41.    Under duress and in fear of losing his career, Plaintiff complied.

42.    Before being compelled to attend the FFDE, Plaintiff sought his own private fitness for duty physical exam, and a thorough psychological fitness for duty evaluation.

43.    On October 19, 2023, Plaintiff obtained his own general fitness for duty physical examination with his family doctor, to whom he provided a copy of an official Border Patrol Agent job description.

44.    The doctor that performed the physical examination cleared Plaintiff for full duty without restrictions.

45.    On October 20, 2023, Plaintiff obtained his own clinical fitness for duty psychological evaluation, scheduling/attending evaluations on October 27, 30, and December 11, 2023.

46.    Those sessions included several hours of thorough clinical psychological testing, interviews, questioning, personal history, work history including performance record, collateral data, and review of the agency's formal letters and official Border Patrol Agent job description.

47.    Through many hours of clinical testing, interviews, questions, personal history, work history, performance record, collateral data, agency letters, and official job descriptions, Plaintiff's psychological and personality profile did not result in any form of diagnosis.

48.    Plaintiff was thereafter cleared by his treaters to return to work as a Border Patrol Agent in full duty capacity without restrictions.

49.    On November 6, 2023, Plaintiff was instructed to report for a general medical exam with an Agency doctor on November 21, 2023.

50.    Under threat of discipline and/or threatened removal from federal service, Plaintiff underwent the general medical exam.

51.    The Agency doctor reported of Plaintiff: "No Findings; Healthy."

52.    On December 8, 2023, Plaintiff was instructed to report for an Independent Medical Evaluation on December 21, 2023 with an Agency-contracted psychologist.

53.    This was an order for a psychological evaluation; threats of discipline and removal from federal service continued.

54.    Under duress and for fear of losing his career, Plaintiff decided to attend the Agency-ordered psychological evaluation.

55.    However, on December 12, 2023 and December 19, 2023, Plaintiff sought another separate psychological evaluation.

56.    He attended and participated in a psychological evaluation and it was clinically determined Plaintiff suffered no psychological issues.

57.    The psychologist supported the initial doctor's evaluation that was conducted on October 27th, 30th, and November 11, 2023, which had determined there was no diagnosis of any kind.

58.    On December 21, 2023, Plaintiff attended a 2 hour, and 20-minute agency contracted psychological evaluation in a hotel room; included in that session was about an hour's worth of true/false testing.

59.    Based on that one evaluation in a hotel room, the Agency's hired evaluator deemed Plaintiff unfit for duty as a Border Patrol Agent.

60.    The Agency never compared the findings from Plaintiff's treaters with the Agency's hired evaluators, nor did the Agency consult or communicate with Plaintiff's treaters, despite having a signed Authorization to do so.

### Consequences of the FFDE.

61.    On March 18, 2024, Plaintiff received a letter from the Agency informing him that CBP's Medical Review Officer (MRO) determined Plaintiff was not fit for duty to perform any of the essential duties of a Border Patrol Agent safely and efficiently without restriction.

62.    The Agency advised that if Plaintiff sought treatment with prescribed medications for paranoid behaviors, it was possible he could be returned to work in three (3) months.

63.    The Agency, the MRO, and any FFDE evaluators did not see, evaluator, or treat Plaintiff in a treater/patient medical or mental health relationship; therefore, none are allowed to make treatment decisions for Plaintiff like prescribing him medications.

64.    Plaintiff's treaters do not believe that Plaintiff has a diagnosis necessitating prescribed medications.

65.    In a supplemental report, after only reviewing the Agency-contracted psychologist's report, the Agency MRO opined that Plaintiff was not fit for duty for any position within CBP or any other federal agency – administrative or otherwise.

66.    This supplemental report conflicted with the Agency-contracted psychologist's report.

67.    The letter also informed Plaintiff that CBP was unable to offer any option of reassignment due to the MRO's findings that he was not fit for duty for any position within CBP or any other federal agency.

68.    The March 18, 2024 letter was the first time the Agency proposed two options: 1) apply for immediate voluntary or disability retirement, or 2) voluntarily resign.

69.    The letter informed Plaintiff that the Agency could still propose his removal from any federal service, but that his separation would not impact any ability to seek and/or be approved for disability retirement.

70.    This violated Plaintiff's due process rights, and did not provide Plaintiff with any interactive process regarding an accommodation for a perceived disability.

71.    Plaintiff only interacted with one Agency doctor, the Agency's hired psychologist.

72.    The Agency MRO only reviewed the Agency's hired psychologist's report; each gave conflicting opinions.

73.    On April 01, 2024, Plaintiff informed the Agency he was not accepting the terms provided to him as those terms were not applicable to him.

74.    Plaintiff had been medically cleared by his own treaters; multiple physicians and psychologists, including his treating medical doctor, and deemed Plaintiff without any disability or diagnosis.

75.    All treating physicians opined Plaintiff was able to perform the duties of a Border Patrol Agent, without restrictions, including being able to carry an Agency-issued firearm.

**The information the Agency relied supports illegality.**

76.    On June 14, 2024, Plaintiff received the Agency's materials relied upon (MRUs) consisting of 213 pages.

77.    The MRUs included back and forth medical forms – several of which being repeating medical and chain of custody documents, and agency job descriptions.

78.    Of the 213 pages, 52 pages included back-and-forth conflicting emails between upper management, conflicting emails between agents and upper management, other agent's emails reporting "suspicious" circumstances, and one email the Agency purposely omitted a portion of and used that email against Plaintiff in the materials relied upon.

79.    Those 52 pages demonstrate that Agency management shared its perception of Plaintiff's perceived disability and/or medical/psychological status with other employees.

80.    The majority, if not all of those other employees were not authorized to be privy to Plaintiff's medical or psychological state, perceived or otherwise.

81.    The Agency had other agents follow Plaintiff, to report their observations of him.

82.    Agency management also improperly elicited other employees' opinions and observations regarding Plaintiff's perceived disability.

83.    By its disclosures, the Agency did not treat Plaintiff's medical history or perceived disability as confidential.

84.    Such disclosures violate the Rehabilitation Act of 1973.

85.    The Agency's conduct was – and is – discriminatory, and it created/maintains a work environment that is hostile toward Plaintiff.

86.    The Agency failed to reconcile the medical and psychological examinations/evaluations performed by Plaintiff's treaters with the truncated and non-treatment evaluations of hired Agency personnel.

87.    In a supplemental report, the Agency's hired psychologist and Agency MRO admitted that all of Plaintiff's doctors' reports and clinical evaluations were left out of what the Agency's hired psychologist reviewed.

88.    Despite that, the Agency's hired "doctors" determined that Plaintiff was still incapable of performing the essential duties of his position safely and effectively.

89.    However, by way of supplemental correspondence, the Agency contradicted their own hired evaluators by adding the option that Plaintiff could request reassignment to a non-weapon carrying administrative position; but if no position was available, Plaintiff would then have to elect to either apply for voluntary or disability retirement, or voluntarily resign from the federal service.

90.    The Agency never identified what administrative positions were open, if any, to which Plaintiff could apply or be considered.

91.    Further, the Agency had yet to reconcile how Plaintiff's treating medical treaters had opined that Plaintiff was not disabled, and could work full-duty and without restrictions.

**Plaintiff filed his EEO Complaint.**

92.    During the underlying processes, Plaintiff had sought counseling with the Agency EEO because he feared he was being discriminated and retaliated against.

93.    On August 22, 2024, Plaintiff filed a formal Complaint with the EEO, which the EEO accepted.

94.    Thereafter, on September 11, 2024, Plaintiff signed a 90-day extension requested by the EEO.

95.    That extension has long expired without action taken by the EEO.

**Plaintiff is proposed to be removed from federal service.**

96.    On March 13, 2025, the Agency authored a letter which Plaintiff received, proposing his removal from federal service "not more than 10 days after" receiving his response; Plaintiff received the letter on March 17, 2025.

97.    On March 26, 2025 Plaintiff promptly requested all materials the Agency relied upon to support the removal proposal.

98.    The Agency didn't respond to Plaintiff's March 26, 2025 request.

99.    On July 3, 2025, Plaintiff delivered his detailed response to the Agency's proposal to remove him from federal service, highlighting that there was no disability to prohibit him from performing his full duties as a Border Patrol Agent, reiterating that his treaters deemed him fully able to perform all the duties of a weapon-carrying Border Patrol Agent.

100.   Plaintiff was informed the decisionmaker was unavailable for a period of time; yet was also informed that the Agency-assigned representative to forward the response would be returning from vacation on July 14, 2025.

101.   Fearing that the Agency is going to remove him from federal service given more than 10 days have elapsed since his response, but more significantly, because far more than 180 days have elapsed since Plaintiff filed his formal Complaint, Plaintiff now proceeds with his lawsuit relative to his claims of disability discrimination, disparate treatment, hostile work environment, and retaliation.

## COUNT I
## DISABILITY DISCRIMINATION – ADAA

102.   Plaintiff incorporates by reference the preceding paragraphs 1-101 as if fully restated herein.

103.   Plaintiff is perceived or regarded by the Agency as suffering a disability defined in the Americans with Disabilities Act, 42 USC 12101, *et seq*.

104.   The Agency has made known its perceptions and how it regards Plaintiff as disabled.

105.   Plaintiff is qualified for his position as Border Patrol Agent.

106.   The Agency discriminated and continues to discriminate against Plaintiff with respect to his terms, conditions, and privileges of employment because the Agency perceives and/or regards him to be disabled.

16

107.   The Agency treats similarly-situated employees who are not perceived or regarded as disabled more favorably than Plaintiff.

108.   The Agency placed Plaintiff on limiting leave on the basis of his perceived disability, and/or because he is regarded as disabled.

109.   The leave Plaintiff is serving limits his ability to obtain overtime, seek promotion or advancement, including but not limited to seeking GS-13 supervisor positions, and further limits his ability to pursue other federal employment opportunities, all of which would otherwise lead to advancement within the Agency.

110.   The Agency's reasons for taking adverse actions against Plaintiff are a pretext for disability discrimination.

111.   The Agency's discrimination denies Plaintiff the opportunity for full continued employment and adversely affects his compensation, terms, conditions, and privileges of employment in violation of the Americans with Disabilities Act, 42 USC 12101, *et seq*.

112.   As a direct and proximate result of the Agency's conduct, Plaintiff has suffered injuries and is entitled to:

      A. compensation for his loss of wages;

      B. compensation for loss of benefits;

      C. compensation based on limited earning potential;

      D. emotional distress and other non-economic damages;

E. punitive damages (where available); and

F. other incidental and consequential damages, including statutory attorney fees and costs, and costs and fees as elements of damages.

## COUNT II
## RETALIATION – ADAA

113.    Plaintiff incorporates by reference the preceding paragraphs 1-112 as if fully restated herein.

114.    Plaintiff opposed the illegal actions taken by the Agency, including having his personal vehicle searched, and opposed other illegal activities conducted by the Agency, as well as opposing the illegal FFDE.

115.    Contemporaneous with the adverse employment actions taken against Plaintiff, the Agency was aware Plaintiff had opposed the Agency's actions, including obtaining his own treaters' opinions to contradict Agency-hired opinions, and also engaged in protected EEO activities directly related to his ADAA-recognized and perceived disability.

116.    The Agency retaliated and is retaliating against Plaintiff regarding position, job performance, pay, terms, and/or privilege of employment because of Plaintiff's actions in reporting his belief a hostile work environment exists, in substantial part because he opposes the Agency's perception he is disabled.

117.    The Agency retaliated and is retaliating against Plaintiff regarding pay, terms, or privilege of employment because of Plaintiff's involvement in the EEO process.

118.   The Agency's alleged reason for continuing Plaintiff on leave, and now proposing him for removal from Agency and/or federal service is a pretext for retaliation.

119.   The Agency's alleged reason for forcing Plaintiff to undergo a FFDE was a pretext for retaliation.

120.   As a direct and proximate result of the Agency's conduct, Plaintiff has suffered injuries and is entitled to:

      A. compensation for his loss of wages;

      B. compensation for loss of benefits;

      C. compensation based on limited earning potential;

      D. emotional distress and other non-economic damages;

      E. punitive damages (where available); and

      F. other incidental and consequential damages, including statutory attorney fees and costs, and costs and fees as elements of damages.

**COUNT III**
**DISABILITY DISCRIMINATION – REHABILITATION ACT OF 1973**

121.   Plaintiff incorporates by reference the preceding paragraphs 1-120 as if fully restated herein.

122.   Plaintiff is perceived and/or regarded as disabled.

123.   That which is the perceived/regarded disability is defined in the Rehabilitation Act of 1973, 29 USC 701, *et seq*.

124.   The Agency is a federal agency as defined by what is commonly known as "Section 501" of the Rehabilitation Act.

125.   As a federal agency, the Agency is prohibited from discriminating against in the course of his employment.

126.   The Agency knew or had reason to know of its perception of Plaintiff's disability, and the falsity of that perception.

127.   Plaintiff was qualified for his position.

128.   The Agency discriminated against Plaintiff with respect to his terms, conditions, and privileges of employment because of Plaintiff's disability or because they perceived him to be disabled or there was a record of his disability.

129.   The Agency acts adversely on the basis of his perceived disability.

130.   The Agency's discrimination denies Plaintiff the opportunity for continued employment and adversely affects his compensation, terms, conditions, and privileges of employment in violation of the Rehabilitation Act of 1973, 29 USC 701, *et seq*.

131.   As a direct and proximate result of the Agency's conduct, Plaintiff has suffered injuries and is entitled to:

> A. compensation for his loss of wages;
>
> B. compensation for loss of fringe benefits;
>
> C. compensation based on his earning potential;
>
> D. emotional distress damages;

E. punitive damages (where available); and

F. other incidental and consequential damages, including statutory attorney fees and costs, and costs and fees as elements of damages.

## COUNT IV
## RETALIATION – REHABILITATION ACT OF 1973

132.    Plaintiff incorporates by reference the preceding paragraphs 1-131 as if fully restated herein.

133.    Plaintiff opposed the illegal actions taken by the Agency, including having his personal vehicle and home searched, other illegal searches conducted by the Agency, as well as opposing the illegal FFDE.

134.    Contemporaneous with the adverse employment actions taken against Plaintiff, the Agency was aware Plaintiff had opposed the Agency's actions, including obtaining his own treaters' opinions to contradict Agency-hired opinions, and also engaged in protected EEO activities directly related to his ADAA-recognized and perceived disability.

135.    The Agency retaliated and is retaliating against Plaintiff regarding position, job performance, pay, terms, and/or privilege of employment because of Plaintiff's actions in reporting his belief a hostile work environment exists, in substantial part because he opposes the Agency's perception he is disabled.

136.    The Agency retaliated and is retaliating against Plaintiff regarding pay, terms, or privilege of employment because of Plaintiff's involvement in the EEO process.

137.    The Agency's alleged reason for continuing Plaintiff on leave, and now proposing him for removal from Agency and/or federal service is a pretext for retaliation.

138.    The Agency's alleged reason for forcing Plaintiff to undergo a FFDE was a pretext for retaliation.

139.    The retaliatory actions taken by the Agency against Plaintiff violate the Rehabilitation Act of 1973, 29 USC 701, *et seq*.

140.    As a direct and proximate result of the Agency's conduct, Plaintiff has suffered injuries and is entitled to:

       A. compensation for his loss of wages;

       B. compensation for loss of fringe benefits;

       C. compensation based on his earning potential;

       D. punitive damages (where available);

       E. other incidental and consequential damages, including statutory attorney fees and costs, and costs and fees as elements of damages.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment against Defendants, in whatever amount Plaintiff is found to be entitled, together with equitable, injunctive, and/or other monetary relief, punitive damages where available, interest as an element of damages, statutory interest, and attorney fees and costs.

## JURY DEMAND

Plaintiff Daniel R. Emplit, by his attorney James C. Baker (P62668) of

Sterling Attorneys at Law, P.C., demands a trial by jury.

Respectfully submitted,

STERLING ATTORNEYS AT LAW, P.C.

By:   /s/James C. Baker (P62668)
      James C. Baker (P62668)
      Attorney for Plaintiff
      33 Bloomfield Hills Pkwy., Ste. 250
      Bloomfield Hills, MI 48304
      (248) 644-1500
      jbaker@sterlingattorneys.com

Dated:  July 22, 2025